**ELI GOTTESDIENER** *(Pro Hac Vice)*
**GOTTESDIENER LAW FIRM, PLLC**
498 7th Street
Brooklyn, New York 11215
Telephone:  (718) 788-1500
eli@gottesdienerlaw.com

**WILLIAM H. BLESSING** *(Pro Hac Vice)*
**THE BLESSING LAW FIRM**
119 East Court Street, Suite 500
Cincinnati, Ohio 45202
Telephone:  (513) 621-9191
bill@blessing-attorney.com

**SUSAN MARTIN (AZ#014226)**
**DANIEL L. BONNETT (AZ#014127)**
**JENNIFER KROLL (AZ#019859)**
**MARTIN & BONNETT, P.L.L.C.**
1850 N. Central Avnue, Suite 2010
Phoenix, Arizona 85004
Telephone: (602) 240-6900
smartin@martinbonnett.com
dbonnett@martinbonnett.com
jkroll@martinbonnett.com

Attorneys for Plaintiffs and the proposed Class

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Levanna C. Traylor; Kevin R. Moses; James Frederic Coy; Gwyn M. Moriarty; Linda M. Phillips; Thomas G. Small; Dwayne E. Cohen; Steve A. Dison; Paul Gillespie, on their behalf of and on behalf of all others similarly situated | No. 08-cv-00918-PHX-FJM |
| Plaintiffs, | **PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND MEMORANDUM OF LAW IN SUPPORT** |
| vs. | |
| Avnet, Inc.; Avnet Pension Plan, | |
| Defendants. | |

# TABLE OF CONTENTS

**INTRODUCTION** ....................................................................................... 1

**BACKGROUND** ......................................................................................... 3

**ARGUMENT** .............................................................................................. 4

**I.     DEFENDANTS ARE LIABLE TO BOTH CLASSES** ................................... 4

**II.    THE LUMP SUM CLASS IS ENTITLED TO THE RELIEF SOUGHT** ..... 5

**III.   THE RESTRICTED CLASS WAS NEVER PROPERLY
        RESTRICTED** ........................................................................................ 8

**IV.    THE RESTRICTED CLASS IS ENTITLED TO THE RELIEF
        SOUGHT** .............................................................................................. 10

**V.     DEFENDANTS' STATUTE OF LIMITATIONS DEFENSE FAILS** ......... 11

        **1.     The Applicable Limitations Period is 15 Years** ................................... 11

        **2.     Defendants Did Not Put Participants on Notice of the Injury that
                Forms the Basis for Their Claims Within the Limitations Period** .... 13

                **A.     Lump Sum Class** ........................................................................ 13

                **B.     The Restricted Participants** ........................................................ 17

**CONCLUSION** ........................................................................................ 17

i

**INTRODUCTION**

Plaintiffs and the Classes respectfully move for summary judgment on their "whipsaw" claims, *i.e.,* their claims that Defendants Avnet Pension Plan ("the Plan") and its sponsor and administrator, Avnet, Inc. ("Avnet"), violated ERISA during the 1/1/94 to 8/17/06 period by calculating participants' "cash balance" formula benefit as the lump sum equal to the amount of the participants' notional account balance instead of as the actuarial equivalent present value of the annual accrued benefit commencing at normal retirement age (age 65) that participants could have received under the terms of the Plan.

These incorrect calculations adversely affected members of the Lump Sum and Restricted Participant Classes in distinct ways. *First,* Lump Sum Class members who only received their "account" balance did not receive their entire vested, ERISA-guaranteed, nonforfeitable benefit. *Second,* as a direct result of this incorrect cash balance lump sum calculation, Restricted Participants, who accrued a benefit under the "old Plan" and were thus subject to Plan § 6.10(B) were improperly restricted after terminating with Avnet from receiving a lump sum because the value of their respective cash balance accounts at the time they were incorrectly calculated were less than the respective values of their old Plan accrued benefits. Had the value of their cash balance accounts been calculated in the form of a lump sum in accordance with IRC § 417(e) (ERISA § 205(g), 29 U.S.C. § 1055(g)) (hereinafter "417(e)"), in every case, Plan § 6.10(B) would have posed no obstacle to the Restricted Participants electing to receive their benefit in the form of a lump sum.

The Lump Sum Class seeks make-up payments plus appropriate prejudgment interest (in no case less than the applicable 417(e) rate, since prejudgment interest at a lower rate would in effect leave the original miscalculation partially uncorrected).  The Restricted Participant Class asks for the right to elect a lump sum now, calculated in accordance with the law as it stood prior to the enactment of the Pension Protection Act of 2006 ("PPA"), and based upon having had the option to elect at a prior date (i.e. based upon the best rate that would have been available, had the right to the election been timely given).

Although Defendants contest liability, liability in this case is not only clear – it is dictated by the Court's analysis of the question presented in its 2/13/09 Order (Doc. 104) denying Defendants' motion to dismiss.  Because Plaintiffs' elaboration of that analysis is currently before the Court via Plaintiffs' 4/22/09 motion for partial judgment on the pleadings, Plaintiffs will only comment briefly below as to the various ways in which the evidence developed in discovery further confirms liability.  Next, Plaintiffs outline the remedial decisions that the Court will have to make as to both Classes because while there are areas of broad agreement between the parties and their actuarial experts as to how the calculations should be done, there are also specific disputes requiring resolution by the Court.  Finally, Plaintiffs show below that judgment in the Classes' favor is also ripe as to Defendants' statute of limitations defense, which lacks merit for two distinct reasons:  (1) the limitations period that applies here is the 15-year Ohio statute of limitations for breach of a written contract, *see* Ohio Rev. Code § 2305.06, making all Plaintiffs' and Class members' claims timely whenever they accrued; and (2) Defendants are unable to show

that they ever put either the Lump Sum Participants or the Restricted Participants on notice of the injury that forms the basis of their claims.

## BACKGROUND

The case was originally filed on 9/25/07 in the Southern District of Ohio where the sole original plaintiff, Levanna Traylor, lives and lived, where she worked for Avnet while accruing benefits under the Plan, and where she received in 2001 a lump sum, the calculation of which she challenged as soon as she learned from counsel that there was a basis for doing so. *See* Ex. 1, Traylor Tr. 51-55; Ans. ¶ 16.[1] The case was transferred here on 4/29/08 upon Defendants' motion arguing that transfer was required for the convenience of the parties and the witnesses pursuant to 28 U.S.C. § 1404(a). *See* Doc. 40. On 7/28/08, after obtaining the Court's leave, *see* Doc. 59, Plaintiffs filed an amended Complaint (Doc. 56), which added additional plaintiffs and more specifically articulated the Restricted Participant and related disclosure claims. On 8/19/08, Defendants moved to dismiss, arguing: (1) the four Lump Sum Plaintiffs' claims were "barred" by the PPA; and (2) the four Restricted Plaintiffs' claims were premature because they had not been first presented to the Plan via the Plan's internal claims process. Doc. 66.[2] On 2/13/09, the Court denied Defendants' motion, explaining that: (1) the PPA did not absolve Defendants of pre-PPA liability; and (2) the Restricted Plaintiffs were not required to exhaust their claims because the question of whether these Plaintiffs should have been

---

[1] All numbered "Ex." references refer are to the exhibits attached to the Gottesdiener Declaration; all lettered "Ex." exhibit references refer to the exhibits attached to the Lowman Declaration.
[2] The four Lump Sum Plaintiffs are Levanna Traylor, Kevin Moses, James Coy and Gwyn Moriarty; the four Restricted Plaintiffs are Linda Phillips, Thomas Small, Duane Cohen and Steve Dison. *See* 5/26/09 Class Cert. Order (Doc. 141).

3

offered a lump sum comes down to the same question of statutory interpretation posed by the Lump Sum Plaintiffs.  2/13/09 Order, Doc. 104.

## ARGUMENT

## I.     DEFENDANTS ARE LIABLE TO BOTH CLASSES.

As shown in Plaintiffs' 4/22/09 motion for partial judgment on the pleadings, it is a statutory fact that the accrued benefit used for purposes of determining the minimum lump sum payment is the annuity payable at normal retirement age (under both Treas. Reg. § 1.411(a)(7)(a)(i) and (ii)), not the notional account.  *See* Docs. 135, 139.  Treasury and the IRS have always been clear that the fact that a plan may be drafted to define the cash balance formula benefit as the "account" would not exempt it from the requirements of 417(e) – requirements courts have applied to cash balance plans of widely-varying designs all across the country.  *See* IRS Notice 96-8, 1996 WL 17901, Sec. III.C (Feb. 5, 1996) ("[t]he requirements referred to in this notice apply even in the case of a cash balance plan that defines an employee's accrued benefit as an amount equal to the employee's hypothetical account balance").[3]  Indeed, discovery revealed that when Defendants were called upon by the IRS to demonstrate compliance with anti-backloading requirements, they represented to the IRS that the accrued benefit was (by showing compliance via) the annuity payable at normal retirement age determined *under the terms of the Plan* (*i.e.*, with giving full value under the Plan's interest crediting rate as opposed to merely at the

---

[3] *Accord* 56 Fed.Reg. 47524, 47528, 47584 (Sept. 19, 1991) ("Some of the comments involving cash balance plans also requested that the final regulations provide special relief for cash balance plans from the requirements of section 417(e) . . . The Treasury and the Service have determined that such relief cannot be granted consistent with the requirements of section 417(e)").

4

417(e) rate).  *See* Statement of Facts ("SOF") ¶¶ 16, 18.  Likewise, when illustrating that the benefits provided by the Plan did not discriminate in favor of highly compensated employees, Defendants produced accrued benefits payable at normal retirement age determined under the terms of the Plan in the exact same way.  *Id.*  ¶ 17.  Thus, not only have Defendants by prior acts acknowledged that the Plan provides an accrued benefit in the form of an annuity payable at normal retirement age (thus making the Plan ineligible for treatment under § 1.411(a)-7(a)(1)(ii)), but Defendants have acknowledged *how* that accrued benefit is determined, *i.e.,* by simply dividing the notional account by the factor in App D., Table I.   There is no distinction in law or logic between the "accrued benefit" for purposes of 401(a)(4) (non-discrimination testing) and 411(b) (accrual rules) and the "accrued benefit" for purposes of 417(e) (minimum lump sum provisions).  Thus, when Defendants used the provisions of the Plan to determine the accrued benefit for 401(a)(4) and 411(b) purposes, they admitted that the accrued benefit for all purposes is the annuity payable at normal retirement age determined under the terms of the Plan.[4]

## II.      THE LUMP SUM CLASS IS ENTITLED TO THE RELIEF SOUGHT.

The Court could make Lump Sum participants whole by ordering that additional payments be made to them under either an "Underpayment" or a "Partial Distribution"

---

[4] Indeed, on hundreds of occasions throughout the 1994-2000 time period, *Defendants actually performed whipsaw calculations.  See* SOF ¶ 19.  They did so not to pay cash balance lump sums, however, but to lay claim to a higher 417(e) rate than they would otherwise be permitted to use (the 120% v. 100% PBGC rates that governed at the time – the higher the rate, the lower the lump sum) in making determinations under Plan § 6.10(B).  Defendants' witnesses not only confirmed the practice (and the specific example of Mr. Jones Plaintiffs detail in the Complaint, FAC ¶¶ 59-71), had no explanation for how the Plan could perform whipsaw calculations for the 417(e) purpose of present valuing the old Plan frozen accrued benefit but then ignore the obvious implications of their actions for paying cash balance lump sums.

approach.  *See* Lowman Decl. ¶ 6.[5]   The Underpayment approach determines the

underpayment at the date of the initial lump sum payment and adds interest at a

prejudgment interest rate, whereas the Partial Distribution approach determines the

remaining benefit at 1/1/2010 (the assumed judgment date) and determines the value of

that benefit as a lump sum based on the applicable 417(e) interest rate at the time that the

participant received his or her initial lump sum distribution.  *Id.*   If the prejudgment

interest rate used under the Underpayment approach is the 417(e) interest rate applicable

to the first partial payment, the calculation result under the two approaches is

approximately the same.  *Id.*  As both of Plaintiffs' actuarial experts explain, if the

Underpayment method is used, the prejudgment interest rate used to carry the

underpayment forward to the present must be no less than the 417(e) rate applicable to the

original underpayment.  Anything less would mean that the participant would *still* receive

less than their total accrued benefit as determined under 417(e).  *See* Ex. B, Lowman

6/29/09 Rep. at 3; Ex. 2, Deutsch Tr. 188; Ex. E, Deutsch 6/29/09 Rep. at 15.

   The Court has the discretion to run prejudgment interest at a rate higher than either

the 417(e) rate or the standard 28 U.S.C. § 1961(a) rate (based on an average of the 1-year

constant maturity Treasury yield).  *E.g., Blankenship v. Liberty Life Assur. Co.*, 486 F.3d

620, 627-28 (9th Cir. 2007).  The equities indicate that for all amounts underpaid as of

10/1/00, a higher rate is appropriate here:   by that date, with the Court of Appeals

---

[5] Ex. A, Lowman 4/1/09 Rep. at 10-16; Ex. B, Lowman 6/29/09 Rep. at 1-6; Ex. C,
Lowman Tr. at 96:5-96:9; 150:8-150:13; 155:13-158:21.  *Accord* Ex. D, Deutsch 4/1/09
Rep. at 25; Ex. E, Deutsch 6/29/09 Rep. at 15; Ex. 2, Deutsch Tr. at 189:13-192:5.  The
references are to the opening and rebuttal expert reports and deposition testimony of
Plaintiffs' actuarial experts, Thomas B. Lowman, F.S.A., E.A., and Lawrence Deutsch,
E.A.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

decisions in *Lyons* (August 2000) and *Esden* (September 2000) in hand, and having received ample warnings from their advisors that a "whipsaw fix" was required, Defendants had neither brought the Plan into compliance nor informed current and former participants that the Plan might be required to calculate benefits in a manner differently than it had been paying them out. *See* SOF ¶¶ 44-47, 59-62. Thus, as of 10/1/00, prejudgment interest should run at the higher rate of either 10%, 8%, or 7%.[6]

An additional issue for the Court to decide, under either approach, is whether a pre-retirement mortality assumption or discount ("PRMD") should be applied and if so, whether a "full" or "partial" PRMD should be used. A PRMD results in an actuarial reduction in the lump sum present value of a future payment because it reflects the possibility that a plan participant would not have received any payment - *i.e.*, that the employee may have died before the payment was scheduled to be made. Plaintiffs submit that, consistent with the holding of virtually every case to decide this issue in the cash balance context, *see, e.g.*, *Berger v. Xerox Retirement Income Guar. Plan*, 231 F.Supp.2d 804, 813-17 (S.D. Ill. 2002), *aff'd,* 338 F.3d 755 (7th Cir. 2003), a PRMD should not be taken into account in recalculating the originally owed amount or in calculating the amount due as a second and final distribution because participants cannot replicate the mortality gain outside of the Plan that they could have achieved inside of the Plan. Ex. C

---

[6] 10% is the rate under Ariz.Rev.Stat. §44-1201 for "[i]nterest on any loan, indebtedness, judgment or other obligation." *See Jebian v. Hewlett-Packard Co. Empl. Benefits Org. Inc. Protect. Plan*, No. 99-09548, 2005 WL 3739285, *3 (C.D. Cal. Dec. 16, 2005) (awarding 10% on unpaid benefits per Calif. insurance statute). 8% was the Plan's expected rate of return for the vast majority of the relevant time period for funding purposes, *see* Ex. A, at 15. *See Dishman v. Unum Life Ins. Co.*, 269 F.3d 974, 988 (9th Cir. 2001) (affirming award at rate reflective of insurer's return on investments). 7% is the Plan's internal rate for determining actuarial equivalence, *see* Plan § 6.8. *See Blankenship*, 486 F.3d at 628 (affirming award on analogous basis.

at 110-146.  Alternatively, if a PRMD is used, only a *partial* preretirement mortality discount should be applied.  *Id.*  Thus, if participants' benefits are discounted for mortality, participants should be compensated for the value of death benefits that would be owed to their beneficiaries during the time period between payment of the benefit and retirement.  *Id.*

### III.    THE RESTRICTED CLASS WAS NEVER PROPERLY RESTRICTED.

Defendants argue that Restricted Participants would still be ineligible for a lump sum even if whipsaw were required during the relevant time because the term "Cash Balance Account" in § 6.10(B) can be read as referring merely to the bookkeeping entry-notional account balance instead of as the value of the notional account, *i.e.,* the lump sum benefit that would actually be due.  Doc. 136 at 7-9.  The Court has already rejected this argument:  Defendants cannot explain what other sense can be made of the Court's ruling that the Restricted Plaintiffs need not exhaust administrative remedies because their claim poses the same question as the Lump Sum Plaintiffs' claim, *i.e.,* "whether ERISA requires the application of a whipsaw calculation using federally prescribed rates in determining a participant's Cash Account Balance."  Doc. 104 at 6.[7]

In any event, the only possible construction of the term "Cash Balance Account" in the first sentence of § 6.10(B) is that it refers to the value of the notional account (the benefit due) and not the mere bookkeeping entry of what the notional account balance is at that point in time.  To make the contrary argument, Defendants first must alter key

8

wording of the Plan provision in question, arguing that "it states that employees are ineligible for lump sum payments if *the present value* of their pre-1994 Plan benefit is greater than their 'Cash Balance Account.'" of a Participant." Doc. 136 at 8 (emphasis added). What the Plan document actually says is "if the *Actuarial Equivalent* of the Pre-1994 Retirement Benefit of a Participant . . . ." Plan § 6.10(B). The term "Actuarial Equivalent" is defined in Plan § 6.8, and it is *not* "present value." Rather, the definition explains:

> The term "Actuarial Equivalent" means **a benefit** of equivalent *value* to **the benefit** that it replaces, in accordance with actuarial assumptions adopted by the Committee from time to time or, for certain lump sum distributions, as may be provided in subsection 6.10(C) if the use of such assumptions would provide the Participant with a higher **benefit**.

*Id.* (emphasis added). "Actuarial Equivalent" is, in effect, a formula that compares the *value* of two different **benefits** where Benefit A has the same *value* as Benefit B (using the appropriate actuarial assumptions). In Plan § 6.10(B), Benefit A is the pre-1994 benefit, and Benefit B is the Cash Balance Account. Thus, if actuarial equivalence is determined based on an immediate lump sum basis, then the *value* of the Cash Balance Account **benefit** must be the whipsawed account balance because the notional account balance is a bookkeeping entry and not a benefit at all. Thus, the whipsawed account balance (the **benefit**) must be compared to the present value of Benefit A.[8]

This reading is confirmed by the remainder of Plan § 6.10(B), which restricts benefits for Highly Compensated Employees to remain compliant with the Code's

---

[8] Had the Court believed there was a colorable argument that "Cash Balance Account" is a reference to something other than the participant's accrued benefit, the Court would have necessarily done one of the following three things: (1) ordered exhaustion; (2) reached Plaintiffs' alternative contention that exhaustion was futile; or (3) held the issue in abeyance pending a ruling on whipsaw and/or Plaintiffs' cutback claim.

401(a)(4) nondiscrimination requirements.   The second half of Plan § 6.10(B) would be nonsensical if the term "Cash Balance Account" did not refer to the benefit to be paid and instead a mere bookkeeping entry.   The nondiscrimination rules test *benefits,* not bookkeeping entries.   Avnet's counsel Mark Bogart, who drafted the provision in question, clearly understood this.[2]

Additional confirmation is contained in Plan § 5.1.  Plan § 5.1 provides that "[t]he Normal Form for the Cash Balance Portion of the Plan is a lump sum distribution of a Participant's Cash Balance Account."  This provision thus divides the total benefit into the Pre-1994 benefit and the Cash Balance Portion of the benefit.  For a participant with *no* Pre-1994 benefit, the Cash Balance Account is clearly the participant's *entire* benefit.

## IV.   THE RESTRICTED CLASS IS ENTITLED TO THE RELIEF SOUGHT.

The Restricted Participants seek all available relief under ERISA § 502(a), including but not limited to a declaration that Defendants incorrectly denied them their right to elect a lump sum after termination with Avnet, together with an order directing Defendants to inform the Class about their entitlement to now elect a lump sum (or an annuity) and permit them to do so.  The question thus arises regarding how such lump sums, if elected, should be calculated.  First, whipsaw must be applied even if the

---

[8] There is no dispute that in all cases Benefit B will be higher, permitting the payment of the whipsawed account balance as a lump sum.

[2] *See* Ex. 3 (internal memo discussing Plan § 6.10(B), saying: "Consistent with the approach taken in 1994, the GATT assumption is used to measure the pre-1994 accrued benefit against the Cash Balance Account to see if a Participant is eligible for a lump sum distribution. As we have discussed, this approach differs from the IRS's position (and recent Federal Appeals Court cases) *where the Cash Balance Account has to be converted to an annuity at age 65 (based on the Plan's actuarial assumption) and then present valued to a lump sum based on GATT assumptions.* This is commonly referred to as the whip-saw effect"). If the Plan draftsman thought that "the Cash Balance Account" could plausibly be read to mean the mere notional account balance, he would have said so.

remedial payment is made post-PPA – this follows from the Court's 2/13/09 Order rejecting Defendants' arguments in favor of retroactive application of PPA.  Second, the issue of which applicable 417(e) rate to use for lump sums now elected is presented; unlike the Lump Sum Participants, the Restricted Participants received no prior distribution.  Plaintiffs, in accordance with their experts, submit that the current 417(e) rate used by the Plan should apply that would have been in effect as of January 2009 without regard to the change in the law (*e.g.*, 30 year Treasury securities, as prescribed by 417(e)(3)(A)(ii)(II), prior to changes by PPA, and ignoring the blend with the segment rates based upon bond rate, as prescribed by the changes made to 417(e)(3) by PPA) so as to not reward the Plan with a windfall via the law change for delaying the availability of a lump sum form of payment and the litigation to take advantage of future law changes not in effect at the time that the litigation commenced.  Use of the current Plan rate (absent the law change) is required to make participants electing a lump sum now whole, even absent a consideration of the fact that the miscalculation deprived participants of the right to time their election. Ex. B at 9-10.  Per the rationale of 417(e), had participants been allowed to receive their whipsawed lump sum pre-PPA, they would have invested their distribution in 30 year Treasury bonds in such a way so as to reproduce the annuity form of payment provided by the Plan.

## V.    DEFENDANTS' STATUTE OF LIMITATIONS DEFENSE FAILS.

### 1.    The Applicable Limitations Period is 15 Years.

The applicable limitations period is determined by way of a choice-of-law and most-analogous claim inquiry.  The limitations period must be borrowed from analogous

state law because the provisions of ERISA under which these claims are brought does not contain its own statute of limitations; which state's law governs for this purpose is a federal question. *Wang Lab, Inc. v. Kagan*, 990 F.2d 1126, 1128 (9th Cir. 1993). As the Ninth Circuit held in *Wang,* "[i]n an ERISA case, we ordinarily borrow the forum state's statute of limitations." *Id.* However, that does not make Arizona law applicable here because it is well-settled that the Avnet-initiated venue transfer "with respect to state law [was] but a change of courtrooms," *Van Dusen v. Barrack*, 376 U.S. 612, 639 (1964), meaning that Ohio remains the "forum state" even after the transfer.[10] *See, e.g., Stewart v. AT&T Inc.,* No. SA-08-CA-272-H, slip op. at 2-3 (Ex. 4) (W.D. Tex. July 29, 2008) (transferred-from-Ohio ERISA putative class action applying Ohio's 15-year written contract limitations period instead of Texas' 4-year contract period).

The next step in the inquiry is to determine which specific limitations period under Ohio law to borrow. This too is a federal question. *Wang,* 990 F.2d at 1128. Ohio's statute of limitations for breach of a written contract, *see* Ohio Rev. Code § 2305.06, governs because in this Circuit, the limitations period applicable to ERISA claims is the one for breach of written contract. *Wang,* 990 F.2d at 1128; *Loewy v. Ret. Comm., Plan Adm. of the Motorola, Inc. Pens. Plan,* No. 03-CV-2284-PHX-FJM, Doc. 103 (D. Ariz. Mar. 30, 2005) (Ex. 5). Thus, all Plaintiffs and Class members claims are timely no matter when they accrued because the case was filed within the applicable 15-year limitations period.

---

[10] This is the rule not just in diversity cases, *Ferens v. John Deere Co.*, 494 U.S. 516 (1990), but also in all federal question cases where state law is borrowed to supply the limitations period. *See Eckstein v. Balcor Film Investors*, 8 F.3d 1121, 1126-27 (7th Cir. 1993).

12

## 2. Defendants Did Not Put Participants on Notice of the Injury that Forms the Basis for Their Claims Within the Limitations Period.

Even assuming a shorter limitations period, Defendants cannot show that they put any Plaintiff or Class member on notice of the injury that forms the basis of their claim within any of the shorter limitations periods that Avnet advocates.[11] The discovery rule dictates that the statute of limitations begins to run "not [on] the date on which the wrong that injures the plaintiff occurs, but that date-often the same, *but sometimes later*-on which the plaintiff discovers he has been injured." *Cada v. Baxter Healthcare Corp*., 920 F.2d 446, 450 (7th Cir. 1990) (Posner, J.) (emphasis added); *accord North. Cal. Retail Clerks and Food Empl. Joint Pens. Trust Fund v. Jumbo Markets, Inc,* 906 F.2d 1371, 1372 (9th Cir. 1990) (ERISA case; "when the plaintiff knows or has reason to know of the injury"); *Chuck v. Hewlett Packard Co.,* 455 F.3d 1026, 1031 (9th Cir. 2006) ("a clear and continuing repudiation" does not occur unless the participant "has reason to know" of his injury, *i.e.,* "that ***his claim*** has been . . . denied") (emphasis added).

### A. Lump Sum Class

There is no credible argument that upon receipt of their respective lump sums in an amount equal to what Defendants had always told them was what they were entitled to receive that Plaintiffs and Class members should have understood that they had been ***injured***. *See, e.g., Loewy,* Order at 19-20 (defendants did not establish "limitations began to run when plaintiff received his first pension check" because "[d]efendants have failed to show how plaintiff knew or should have known that his pension checks did not contain

---

[11] There is no evidence that any Plaintiff had *actual* knowledge of his or her claim prior to the expiration of the shortest limitations period that Defendants advocate. Nor are Plaintiffs aware of any evidence that any Class Member had such knowledge.

the actuarial increase he claims").   Although Defendants couch their discussion in the language of the discovery rule (or its variant, the "clear repudiation" test), the standard Defendants are actually seeking to have applied (and must, on these facts, if they have any hope of even creating a genuine issue of material fact for trial) is the polar opposite of an injury-discovery test:  it is a pure injury-*occurrence* standard, the unfairness of which (especially in a highly technical setting such as this) the discovery rule exists to counteract.[12]  Thus, the Court will never see an explanation from Defendants as to how their payment of lump sums equal to the notional account balance (or "disclosure" to participants of the "fact" that all participants could ever expect to receive was their account balance) constituted *notice* to participants that payment of the account balance inflicted ***injury***.  No such explanation is possible.

First, the Plan's Summary Plan Description ("SPD") assured participants that the new Plan was as good as the old – in fact, that it was even better because it offered a lump sum form of payment.  *See* Doc. 66-2 at 1.  Nothing in the SPD even remotely suggested that electing the lump sum required *forfeiting* benefits or accepting a lump sum calculated solely in accordance with *the Plan's* definition of actuarial equivalence or that such definition, for purposes of computing lump sums, was *contrary* to the law's definition of actuarial equivalence.  *Compare* 29 U.S.C. § 1022(a) & (b) (in a manner "calculated to be understood by the average plan participant," SPD must disclose "circumstances which may result in disqualification, ineligibility, or denial or loss of benefits").  *Second,* the SPD plainly

---

[12] *See, e.g., Menhorn v. Firestone Tire & Rubber Co.,* 738 F.2d 1496, 1501 (9th Cir. 1984) ("it would be burdensome and unfair to require lay participants and beneficiaries to be constantly alert for possible errors or abuses that might give rise to a claim and start the statute of limitations running").

implied in its discussion of the use of the PBGC rates solely for the purposes of calculating the old Plan benefit as a lump sum, *see* Doc. 66-2 at 8, that the calculation of the cash balance benefit's lump sum form was not similarly governed – Defendants now concede that it was. *Third,* the SPD tells participants that their account is like a "savings account" and that the determination of their lump sum is a simple matter of looking at their ending account balance when in fact Defendants concede that this "method" of calculating is incorrect– it is why Defendants spend time spinning complicated theories about how the Plan can pay the notional account balance by projecting only a *portion* of the Plan's interest crediting rate (*i.e.,* that equal to the discount rate) – another "fact" which participants were never informed.

Defendants are reduced to sophistry – *i.e.,* to arguing that payment of the account balance was a "clear repudiation" of <u>a claim to anything **more**</u> when obviously, and especially based on the foregoing "disclosures," no ordinary participant would have had any idea that he or she had <u>a ***claim*** to more</u>.

Stripped to its core, Defendants' argument is nothing more than the adage "ignorance of the law is no excuse." *See* Doc. 37 at 3-6. But as Judge Kozinski explained in *Bibeau v. Pacif. North. Research Found. Inc.* 188 F.3d 1105 (9th Cir. 1999), in reversing a defense judgment on limitations grounds obtained through argumentation very similar to that advanced here:

> Defendants rely on the adage that everyone is presumed to know the law, but that is actually a misstatement of the rule. What the law presumes is that everyone is aware of *the **obligations** the law imposes on them.*

*Id.* at 1111 (emphasis added).   Here, similar to the situation in *Bibeau,* because participants had no *obligation* to know the law governing minimum distribution rules from defined benefit pension plans, they cannot "deemed to be aware," Doc. 37 at 3, of either that law or the injury resulted from Defendants' noncompliance.   Indeed, quite the opposite is true.[13]

There was (and is) nothing unusual or inherently improper about a cash balance plan paying out lump sums in an amount equal to a participant's account balance:   Notice 96-8 explained how plans could do just that and be compliant with the law.   *Cf. Fink v. Nat'l Savings and Trust Co.,* 772 F.2d 951, 957 (D.C. Cir.1985) (holding in fiduciary breach case that "[t]he disclosure of a transaction that is not inherently a statutory breach of fiduciary duty cannot communicate the existence of the underlying breach").   Defendants have themselves argued in this litigation that even the idea of a "notional" account is "potentially confusing" to participants.   Order (Doc. 150) at 1; *accord* Doc. 144 at 3 ("may be confusing to Class members").   Moreover, discovery established that not even Avnet's Chief Financial Officer, Raymond Sadowski, involved in the new Plan's design and having key responsibility for the administration of the Plan throughout the

---

[13] *See Ruppert v. Alliant Energy Cash Bal. Pens. Plan,* 255 F.R.D. 628, 636 (W.D. Wis. 2009) (noting in class ruling in whipsaw case that "[t]he average plan participant cannot be expected to have even a working understanding about how his pension benefits were calculated *or how the law requires them to be calculated*") (emphasis added); *West v. A.K. Steel Ret. Accum. Pension Plan,* No. 1:02-CV-0001, 2005 WL 1745491, *3 (S.D. Ohio July 25, 2005) (noting in release-of-claims ruling in whipsaw case that "[t]he fact that all AK employees may have been 'aware' of the Plan terms governing lump sum payments is not a sufficient basis upon which this Court could properly conclude that each class member had actual *or constructive knowledge* about the facts concerning a 'whipsaw' calculation") (emphasis added); *accord Kifafi v. Hilton Hotels Ret. Plan,* 616 F.Supp.2d 7, 36-37 (D.D.C. 2009) (backloading violations; "mere receipt of benefits" not clear repudiation of claim to lawfully calculated benefit).

relevant time, nor Paul Graham, the Plan's day-to-day administrator with responsibility for calculating benefits under the Plan, realized that there was or might have been a need to calculate lump sums differently or pay participants lump sums exceeding their notional account balances, until approximately 2000 when their advisors brought the issue to their attention. *See* SOF ¶¶ 48-55, 59-62.[14]

## B.      The Restricted Participants

For all the reasons Lump Sum Class members cannot properly be charged with knowing they were being injured by the Plan's payment to them of their notional account balance, so too the Restricted Participants were also blamelessly ignorant that the Plan was misapplying Plan § 6.10(B).  Even participants who were affirmatively told that they were ineligible for a lump sum had no way of knowing that this was solely because the Plan was miscalculating their cash balance lump sum.

WHEREFORE, for the reasons stated herein, such reasons as Plaintiffs may later adduce and/or such reasons as may appear to the Court, Plaintiffs ask that their motion be granted.

Respectfully submitted this 15th day of September 2009.

**Gottesdiener Law Firm, PLLC**

By: s/Eli Gottesdiener
Eli Gottesdiener *(Pro Hac Vice)*

---

[14] This points up another fatal problem with Defendants' "clear repudiation" argument:  for much of the relevant time, Defendants were unaware of the existence of the claim *so they could not possibly have effectively repudiated it. Cf. Kifafi, supra,* 616 F.Supp.2d at 36-37 ("It is difficult to find a 'clear repudiation' by a party who throughout the period before the suit was filed, and even after it was filed, maintained that it complied with the backloading rules") (citation omitted).

498 7th Street
Brooklyn, New York 11215
Telephone:  (718) 788-1500

**The Blessing Law Firm**
William H. Blessing *(Pro Hac Vice)*
119 East Court Street, Suite 500
Cincinnati, Ohio 45202
Telephone:  (513) 621-9191

**Martin & Bonnett, P.L.L.C.**
Susan Martin
Daniel L. Bonnett
Jennifer Kroll
Martin & Bonnett, P.L.L.C.
3300 North Central Avenue, Suite 1720
Phoenix, AZ  85012-2517
Telephone:  (602) 240-6900

ATTORNEYS FOR PLAINTIFFS AND
THE PROPOSED CLASSES

## CERTIFICATE OF SERVICE

I hereby certify that on September 15, 2009, I certify that I caused the foregoing document and accompanying exhibits to be electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to all CM/ECF registrants and to be served by hand on May 21, 2009 upon defense counsel so designated and listed below:

Robert D. Wick
Covington & Burling LLP
1201 Pennsylvania Avenue, NW
Suite 1003
Washington, D.C.  20004
(BY HAND)

D. Lewis Clark, Jr.
Squire Sanders & Dempsey, LLP
2 Renaissance Sq
40 N. Central Avenue, Suite 2700
Phoenix, AZ  85004
(BY HAND)

Tara A. Aschenbrand
Squire Sanders & Dempsey, LLP
1300 Huntington Ctr
41 S. High Street
Columbus, OH  43215

Attorneys for Defendants

s/Eli Gottesdiener
Eli Gottesdiener